Captain Steven J. **CLARK**, USAFR, Petitioner–Appellee,

v.

Sheila **WIDNALL**, Honorable, Secretary of the Air Force; James H. White, Colonel, Commander, Air Reserve Personnel Center, Lowry Air Force Base, Denver, Colorado, Respondents–Appellants.

No. 94–1208.

United States Court of Appeals, Tenth Circuit.

April 4, 1995.

---

Frank W. Hunger, Asst. Atty. Gen., Washington, DC, Henry L. Solano, U.S. Atty., Denver, CO, and Barbara C. Biddle and Robert D. Kamenshine, Attys., Appellate Staff, Dept. of Justice, Washington, DC, on the briefs, for respondents-appellants.

John A. Wickham of Gary Myers & Associates, Evergreen, CO, on the brief, for petitioner-appellee.

Before MOORE, ANDERSON, and TACHA, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

The Secretary of the Air Force, Sheila Widnall, appeals the district court's order granting Captain Steven J. Clark a preliminary injunction prohibiting his call to active duty. Because the district court ignored the explicit requirement of the contract between the parties calling for resolution of disputes in a military tribunal and otherwise failed to give proper deference to military authority, it erroneously concluded Clark had established grounds for the preliminary injunction. Therefore, the judgment is reversed.[1]

The case deals with several issues arising from a contract between Clark and the Air Force adopted under the Armed Services Health Professions Scholarship Program (HPSP), 10 U.S.C. §§ 2120–2127. This program was established "[f]or the purpose of obtaining adequate numbers of commissioned officers on active duty who are qualified in the various health professions...." 10 U.S.C. § 2121. The statutory scheme commissions a medical student selected for participation in the reserve component of a branch of the armed services in return for the government's covering all educational expenses, including tuition and usually a monthly stipend. 10 U.S.C. § 2121(d). That is, in return for each year's financial assistance, the participant promises to serve a year on active duty. A participant's breach or default is not remedied by damages or repayment. During the course of study, the student is not a civilian, but is a member of the military reserve.

To receive the scholarship, a participant signs the contract which sets forth these

---

1. The case also presents a preliminary jurisdictional question whether the United States failed to file an appeal within 10 days of the district court's order under 28 U.S.C. § 1292(b). The district court, however, granted a preliminary injunction; and the United States timely appealed under § 1292(a)(1). We DENY the motion to dismiss.

terms and states, for example, "I will not be relieved of my active duty obligation solely because I am willing and able to reimburse the Government for the total cost of advanced education." The Graduate Medical Education (GME) portion of the contract requires the student to apply to the Air Force GME Board "in the specialty of my choice ... [i]f selected...." The selected student may complete advanced training either at a military facility or civilian institution. If a program is not available, the military "may defer me for one year of clinical training and then order me to active duty as a general medical or flight medical officer." The student also agrees that only the Secretary of the Air Force "can excuse me from my obligation." Further, the student agrees:

> Should any dispute arise over the terms or conditions of this contract ... I acknowledge, and agree to exhaust my available administrative remedies prior to seeking judicial review. Exhaustion of the Air Force Board for the Correction of Military Records (AFBCMR) remedy ... shall be mandatory in every case except with respect to ... conscientious objector[s]. I will remain subject to active duty or transfer orders while exhausting administrative remedies.

In 1988, Clark, then an oral maxillofacial surgeon having taken advanced training after his general dentistry degree, accepted a scholarship from the Air Force under the HPSP. He returned to medical school in exchange for which he agreed to serve three years on active duty in the Air Force. In 1990, the Air Force granted Clark a five-year deferment allowing him to complete residency training in Otolaryngology (ENT), a specialty in short supply in the Air Force. From June 1990 to June 1992, Clark notified the Air Force that he was participating in a Surgery/ENT program. Sometime in 1992, however, Clark decided he wanted to continue his training in plastic surgery and submitted a different Hospital Agreement Form (HAF), this one indicating he planned to begin a three-year surgery program.

Although Clark received information explaining he must obtain permission to change the specialty training supporting his deferment for postgraduate medical education, he nevertheless applied for a residency in plastic surgery. In April 1992, the University of Chicago accepted him into its three-year residency. He accepted the program in June 1992 to begin in June 1993.

On January 19, 1993, the Air Force's GME Selection Board denied Clark permission to change specialty training on the ground it had an oversupply of plastic surgeons and needed ENT specialists. The Office of the Surgeon General of the Air Force rejected his appeal on April 1, 1993. Although Clark then tendered his resignation, the Secretary of the Air Force refused to accept it.

Notwithstanding the denial of permission, Clark began his plastic surgery residency in June 1993. The Air Force discovered Clark's decision when the Surgeon General forwarded an August 24, 1993 letter from Clark's counsel suggesting a settlement and explaining Clark had begun the program on the advice of counsel.

On September 1, 1993, the Air Force immediately informed Clark of its intention to call him to active duty. Clark appealed the decision to the Office of the Surgeon General and the Secretary of the Air Force, Office of General Counsel. He claimed at age thirty-seven he did "not have expendable years to practice in areas where he is not professionally motivated." Clark was then ordered to report for active duty on March 7, 1994, to serve three years as a General Medical Officer (GMO).

Instead, Clark filed this petition for habeas relief,[2] claiming the "premature termination of plaintiff's medical specialty training program was a violation of due process, arbitrary and capricious agency action, and w[ould] irreparably damage [his] ability to ever train and practice in another surgical specialty." Clark sought a judgment "releas[ing] Plaintiff from military custody by setting aside his active duty orders to permit

---

**2.** He asserted jurisdiction under 28 U.S.C. § 2241 and the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706(2)(A).

plaintiff to complete his medical specialty training program in plastic and reconstructive surgery at the University of Chicago on or about July 1995, before commencing his active duty obligation." Albeit expressing its reluctance to interfere in the internal affairs of the armed forces, the district court nonetheless entered judgment for Clark.

Persuaded by Clark's "credible" testimony that he would suffer career injury were he to abort his plastic surgery residency to become a GMO at age thirty-seven and testimony by "two respected doctors," the court perceived "[t]he indications in this case of a liberty interest and a property interest are very strong." The court also found the implication of irreparable injury. To support this position, the court relied on *Meinhold v. United States Dep't of Defense*, 808 F.Supp. 1455 (C.D.Cal.1993), *aff'd in part, vacated in part, Meinhold v. United States Dep't of Defense*, 34 F.3d 1469 (9th Cir.1994); and *May v. Gray*, 708 F.Supp. 716 (E.D.N.C. 1988).

To explain the court stated:

> This is not just a question ... of Dr. Clark making more money if he's a plastic or reconstructive surgeon. His indication ... is not just to make a lot of money as a plastic surgeon by making people look like Michael Jackson or straightening out noses. He is interested in cleft palates ... facial surgery.... And what he is interested in is very substantial.

These findings predicated the court's conclusion liberty and property interests are involved in this case.

By finding Clark would be irreparably injured, the court continued, in the alternative, granting the preliminary injunction simply postponed the government's access to a GMO in exchange for which the Air Force would get a highly specialized surgeon in fifteen months. "It appears to me that not only would the Government not suffer damage but the Government would indeed be benefited by this injunction which would allow Dr. Clark to finish his training."

The court surmised the only damage to the government occurred when Clark "did not get advance approval before changing his specialty." The court identified this flaw as "the public interest" and believed the public would be better served by utilizing Clark's sophisticated surgical skills rather than getting another GMO. In reaching this decision, the court disregarded the Air Force's expressed assessment of its own needs for medical specialists, however.

*Lundgrin v. Claytor*, 619 F.2d 61 (10th Cir.1980), controls this case on the issuance of the preliminary injunction. There, plaintiff received a Navy scholarship to complete his medical school. In his fourth year, he requested specialized training in pathology and applied to the naval hospital, but was turned down. Though accepted to the program at the University of Utah, the Navy rejected his application for a four-year active duty deferment because it needed GMO's and had no projected needs for pathologists. Nevertheless, the Navy offered him a one-year deferment "to complete a year of graduate medical training." *Id.* at 62. Lundgrin argued the one-year deferment triggered the Navy's obligation to grant him the additional three years to complete his specialty training under the contract; and, alternatively, the contract was ambiguous.

Although the case was presented as a breach of an enlistment contract, and not a habeas action, we concluded Lundgrin failed to raise questions "so serious, substantial, difficult and doubtful as to make them a fair ground for litigation." *Id.* at 63 (citation omitted). Key to this holding was the conclusion the contract was unambiguous. *Id.* at 64.

This analysis must apply here as well. Recalling Clark had to make a *prima facie* showing of a reasonable probability he would be ultimately "entitled to the relief sought," *id.* at 63, we must decide the issues upon the provisions of the contract that formed the rights and responsibilities of the parties. Here, as in *Claytor*, the contract was unambiguous. Not only did it give the Secretary of the Air Force the sole authority to excuse Clark from his military duties, it also provided as a condition precedent to judicial review of any dispute arising from the contract Clark had to exhaust his appeal rights to the Air Force Board for the Correc-

tion of Military Records. Because this action seeks to avoid both of these unequivocal provisions, Clark's prospect for success on the merits of his suit is problematical.

The government concedes, however, when substantial constitutional rights are in jeopardy, a civilian court could exercise jurisdiction over military affairs. Indeed, in *Lindenau v. Alexander,* 663 F.2d 68, 70 (10th Cir.1981), we dealt with such a circumstance. Although we ultimately denied judicial review, we adopted the four-part test of *Mindes v. Seaman,* 453 F.2d 197, 201–02 (5th Cir.1971), which established those areas in which a federal court could appropriately review military action. Noting the traditional reluctance of courts to intervene in military affairs, *Schlesinger v. Ballard,* 419. U.S. 498, 510, 95 S.Ct. 572, 578–79, 42 L.Ed.2d 610 (1975), and the role of federal courts in the "internal affairs of the military is narrow and restricted," *Schulke v. United States,* 544 F.2d 453, 455 (10th Cir.1976), we held courts may review military action to determine whether military officials have acted within the scope of their powers. *Lindenau,* 663 F.2d at 71. Additionally, courts may entertain actions against military officials "for violating their own regulations" and "questioning the constitutionality of statutes relating to the military, executive orders, and regulations." *Id.* Also included in the scope of review are "[c]ourt-martial convictions alleged to involve errors of constitutional proportions" and selective service "induction procedures." *Id.* (citation omitted); *see also Noyd v. McNamara,* 378 F.2d 538, 540 (10th Cir.) (Wide discretion is given to the military to decide what constitutes "for the good of the service."), *cert. denied,* 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967).

Given these specific limitations within which a civilian court may deal with military affairs, it is noteworthy that Clark appears before us, not as a civilian student, but as a reserve officer in the United States Air Force seeking to prevent the issuance of an order from his military superior. Thus, he has thrust the court squarely into a dispute founded upon his personal unwillingness to comply with authority he freely accepted in exchange for the furtherance of his profes-

sional education by the taxpayers. While he would like the court to consider this dispute as one involving his constitutional freedoms, when properly viewed, that attempt is seen to be without a fundament.

We denigrate neither Clark's sincerity of purpose nor the importance of his medical education. Indeed, his pursuits will doubtless benefit members of the public in the future. Those laudatory circumstances notwithstanding, as an officer who has committed himself to certain conduct in exchange for valuable benefits, Clark is subject to the authority of his commander. Having failed to demonstrate the military authority has acted in any way that would justify the interference of a civilian court, Clark's action must fail. Following that conclusion, we judge the remaining arguments unpersuasive.

**JUDGMENT REVERSED AND REMANDED WITH INSTRUCTIONS TO DISMISS THE COMPLAINT.**

