**Elizabeth K. SAUM, Plaintiff,**

v.

**Dr. Sheila WIDNALL, Secretary, United States Air force, ex officio, et al., Defendants.**

**Civil Action No. 95–K–1340.**

United States District Court,
D. Colorado.

Jan. 29, 1996.

Doris Besikof, Denver, CO, for Plaintiff.

J. Benedict Garcia, Assistant U.S. Attorney, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Air Force Academy cadet Elizabeth Saum initiated this action on May 25, 1995, asserting three claims for declaratory and injunctive relief against United States Air Force ("Air Force") Secretary Sheila Widnall and certain Air Force officers in their official capacities, and against various "John Doe" cadets and non-commissioned officers in their individual capacities. Jurisdiction, justiciability and abstention are the concepts forming the nexus of the instant controversy.

This case raises difficult and complex questions regarding the proper role of the courts in reviewing the conduct of military personnel and the military generally. It also presents novel issues regarding the nature and scope of relief, if any, available against the military when it violates the constitutional rights of one of its own. After careful review of the Amended Complaint as well as the parties' briefs and oral argument on the *ex officio* defendants' motion to dismiss, I find I have jurisdiction over Saum's claims and that Saum's claims are reviewable.

Saum claims she was sexually harassed and abused at the Academy generally, and in particular during her mandatory participation in the Academy's 1993 Survival Escape Resistance and Evasion Training (SERE). She maintains defendants' failure to comply with or to enforce Air Force rules and regulations prohibiting such treatment, and failure after she reported the events at SERE either to enforce certain punitive arti-

cles of the Uniform Code of Military Justice (UCMJ) or to accord her "crime victim" status under the Victims' Rights and Restitution Act of 1990, 42 U.S.C. § 10607 and Department of Defense (DOD) Instruction No. 1030.2, violated her liberty, due process, and equal protection rights under the Fifth and Fourteenth Amendments to the United States Constitution. For her relief, Saum seeks a declaration under Fed.R.Civ.P. 65(1) that her constitutional rights were violated and (2) that she is a "crime victim" under § 10607 and DOD Instruction No. 1030.2. Saum also seeks a preliminary and permanent injunction requiring defendants (3) to release all information obtained during their investigation of her complaints and (4) to accord her "crime victim" status with all its attendant rights and benefits.

After the release of additional information by the Air Force in June 1995, Saum filed an Amended Complaint. The Amended Complaint identified certain of the "John Does" by name and added six claims for compensatory and punitive damages against the individual defendants.[1] It also clarified that the equitable relief sought against the *ex officio* defendants included restitution based on a theory of unjust enrichment.

Before me now is the *ex officio* defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. These defendants assert I lack subject-matter jurisdiction over Saum's claims and maintain Saum has failed to allege a jurisdictional basis for relief. Alternatively, defendants urge me to abstain from reviewing defendants' conduct because doing so would "embroil" the court in matters concerning military training in violation

of *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) and *Lindenau v. Alexander et al.;* 663 F.2d 68 (10th Cir.1981) (adopting the four-part test for reviewability articulated by the Fifth Circuit in *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971)).

Defendants also assert Saum's claims for declaratory and injunctive relief are non-justiciable under *Gilligan* because they have been mooted by subsequent events so that Saum lacks standing to pursue them. Saum's request for "restitution," they argue, is actually a claim for monetary damages barred by *Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950) (barring claims brought under the Federal Tort Claims Act against the military for injuries to servicemembers arising out of or incident to military service). Finally, defendants argue there is no private right of action under the Victim of Crimes Act and urge dismissal of Saum's request for "crime victim" status for failure to state a claim upon which relief can be granted.[2]

Saum insists her claims are reviewable and, because she seeks only equitable relief, denies *Feres* applies. Review is appropriate, she argues, because it would neither require the court to scrutinize a particular military decision nor to intrude into matters affecting military discipline, training or readiness. According to Saum, this is an action challenging defendants' allegedly unconstitutional conduct and failure to comply with their own rules and regulations. The rights at issue are "fundamental," she argues, and the alleged violations "extreme." Under these circumstances, Saum maintains it is within my

---

1. These include a *Bivens* claim seeking relief for the alleged violation of Saum's liberty interest in safety and from bodily harm, her rights to equal protection under the law and due process, and her property interest in her contractual relationship with the Air Force (Fourth Claim for Relief); and five tort claims for negligence *per se* (Fifth Claim for Relief); intentional and negligent infliction of emotional distress (Sixth Claim for Relief); outrageous conduct (Seventh Claim for Relief); tortious interference with contract (Eighth Claim for Relief); and civil conspiracy (Ninth Claim for Relief).

2. Defendants also move to dismiss the six damages claims Saum asserts against the individual defendants. Defendants argue this court lacks

personal jurisdiction over these defendants (Saum has yet to complete service on certain of these defendants, who either remain unidentified and/or have left the Academy), and that the individual defendants are immune from suit under *Feres.* Saum responds that the *ex officio* defendants lack standing to raise the personal jurisdiction and *Feres* defenses on behalf of the individual defendants. She also asserts the *Feres* defense is premature in that the Air Force has yet to certify whether the individual defendants were acting within the scope of their authority at the time of the events at issue. Unless the Air Force does so, Saum argues *Feres* will not apply. I do not address Saum's claims against the individual defendants and limit my consideration here to her first three claims for relief.

discretion to accept jurisdiction over her claims, declare defendants' conduct unconstitutional and fashion an equitable remedy sensitive both to the military's need for autonomy and her right to redress.

## I. *FACTS*

For the purposes of this motion, the allegations in Saum's Amended Complaint and affidavit incorporated by reference therein are taken as true. Thus understood, the following facts are asserted:

In early 1992, plaintiff Elizabeth "Libby" Saum was a senior at a Toledo, Ohio, Catholic prep school. She was an excellent student, president of the Spanish club and a diving champion. She had won early admission to Davidson College in North Carolina and a full tuition scholarship. Offers from other schools had come in as well. She also caught the attention of the Air Force Academy.

The Academy began recruiting Saum for its diving team. Although the application deadline had passed, Saum was invited to visit the Academy in Colorado Springs. Drawn by the promise of an education valued at $230,000, as well as an opportunity to attend medical school and other benefits, Saum turned down her other offers and accepted an appointment to the Academy.

Saum arrived at the Academy in the summer of 1992. She was 18 years old. At 5'3" and in excellent physical condition, she weighed 100 lbs. Beginning at once, Saum was subjected to harassment "so verbally and physically abusive" as to create an intimidating and offensive work environment. The harassment was nearly always sexual in nature. It included being called to the office of a professor and told she was "too feminine" and "too pretty" to be an officer; being called a "bitch" and a "whore" and subjected to constant rumors and taunting about her supposed sexual conduct and preferences;

being prohibited from locking her dormitory room door at night after upperclass male cadets continued to come in uninvited; being required to stand at attention and stare at posters of offensive, nude or partially clothed women; and being singled out to recite knowledge on command by other cadets in a manner different from male cadets. She maintains she was targeted for this abuse because of her sex and petite, feminine appearance. Despite this treatment, Saum made the dean's list for academics as well as the dean's list for athletes each semester until her departure in 1994.

In June 1993 Saum participated in mandatory Survival, Escape, Resistance and Evasion training (SERE). She had been warned all year that upperclassmen were "going to get her" at SERE. Upon arrival with other cadets for training, she was selected as the victim in a simulated rape and exploitation scenario. Within earshot of her co-"prisoners," she was forced to lie on the ground, her shirt was removed and her legs pried apart. She was hooded during the proceedings and does not know the identities of the participating cadets. Other cadets stood by and observed, joking about what was occurring, until an NCO halted the event.

The simulated rape was filmed and the videotape shown to other cadets at SERE. In addition, Saum alleges she was shaken so violently—without the required neckroll or other protection—that she suffered bruises to her chest, neck and ribs requiring medical attention.[3] Her "training," she asserts, included having to kneel down while a male cadet put his crotch in her face and made sexually explicit comments to her, having her fatigues soaked with urine, and being forced to put a stick in her pants and call it her "masturbation stick." Compared to male participants, Saum was singled out for a disproportionate number of "beatings," "interrogations," and "torture,"[4] most of which were

---

**3.** This shaking, known as "manhandling," was a permissible element of SERE training at the time of the events in question, provided it was administered within certain narrowly tailored guidelines. Saum alleges those guidelines, which require use of a protective neck device and prohibit the recipient from being lifted off the ground, for example, were not followed in her case. She was so sore from her manhandling at SERE that

she could not lift her arms. As a result, she failed the physical that would have allowed her to participate in jump school later that summer.

**4.** Torture included being required to assume stress positions to the point of passing out. Saum alleges she twice lost consciousness during her treatment as a "prisoner" at SERE.

sexually charged. This treatment was a continuation of the harassment she suffered throughout her service at the Academy and was directed at her solely because of her sex. Though other female cadets were harassed, the frequency and severity of her ill-treatment was accentuated because of her appearance.

After she completed SERE training, Saum showed her bruises and described her experience to defendant Stoneman, who referred her to defendant Kummerfeldt. When she met with defendant Kummerfeldt in late June or early July of 1993, she was asked whether she wanted to "press charges" based on the incidents at SERE. Fearing further retaliation if she did, Saum declined. During that meeting, defendant Kummerfeldt instructed Saum not to speak with anyone about her SERE experience.

Saum sought medical attention for her bruises and was examined by defendant Guzman in late June. Defendant Guzman documented her injuries, but did not request an investigation of what had occurred. Saum was not referred for counselling or any further de-briefing on the events at SERE.

During the 1993–94 school year, Saum began exercising compulsively and developed difficulty eating. She became so thin that she was unable to compete as a diver. Her weight loss was treated as a purely physical problem, and she was referred for a medical evaluation. On June 2, 1994, Saum was placed on "medical turnback" for one year because, at 85 lbs., she was underweight.[5] Her weight loss was attributed to "life circumstances," without any acknowledgement of its connection to SERE or the sexual harassment she had suffered at the Academy.

On June 13, 1994, Saum requested an investigation of the events at SERE. An investigation was launched by Colonel Beasley, but Saum had difficulty obtaining information on its progress. In October 1994, she notified the Secretary of the Air Force, by letter, of the events that had occurred with footnotes to more than 80 regulations she thought had been violated by the Air Force

and various Air Force personnel. The letter suggested the implementation of voluntary, monitored programs to protect women at the Academy and requested cooperative resolution of Saum's claims. Saum was sent claim forms by Air Force Chief of Tort Claims and Litigation, but otherwise received no response to her letter. The October letter was then forwarded to the Air Force Board of Governors with a separate letter requesting prompt reply.

In December 1994, the Air Force launched a second investigation under the auspices of General Kinnan and Colonel Sanborn. As part of the arrangements for Saum's participation in the investigation, she was given a copy of the Beasley report—which acknowledged she was injured during SERE—with names obliterated. Saum was told she would not be given any information on the progress of the Kinnan/Sanborn investigation until a final report was issued. That report, too, was to be issued with names obliterated. In February 1995, Air Force General Counsel Florence Madden informed Saum the Air Force would not discuss the October or December letters while an official inquiry was pending.

On April 5, 1995, the U.S. General Administrative Office (GAO) issued its March 1995 report to Congress titled "DOD SERVICE ACADEMIES, Update on Extent of Sexual Harassment, GAO–NSIAD–95–58." According to Saum, the report documents an increase in sexual harassment at the Academy and a hostile environment for female cadets, with a declining belief among female cadets that the rules and regulations prohibiting harassment are being enforced.

On April 7, 1995, Secretary Widnall issued a press release indicating that future SERE training would use videotapes instead of physical contact, and announced the practice known as "manhandling" would be discontinued. The press release was apparently issued in anticipation of an ABC television news program that was to be aired that same night. The program, "20/20", featured a segment on two other incidents of sexual harass-

---

5. Saum's "medical turnback" status was continued indefinitely on March 31, 1995, and remains in effect.

ment that allegedly occurred during the Academy's 1993 SERE training. Until she saw the segment, Saum asserts she was led by defendants to believe hers was the only complaint arising out of SERE. On April 28, 1995, Secretary Widnall announced that the resistance and evasion elements had been dropped from the Academy's SERE training program.

At least two delays in the release of the Kinnan/Sanborn report were announced during the spring of 1995. The last one, in May 1995, announced a delay of at least 60 days. These delays, the knowledge that the identities of her alleged abusers would continue to be withheld, and concern that the statute of limitations might run on her claims against the Air Force prompted Saum to file the instant suit in May 1995.

## II. *JURISDICTION*

Defendants argue Saum has failed to allege a jurisdictional basis for relief and seek dismissal of her claims under Fed.R.Civ.P. 12(b)(1) for lack of subject-matter jurisdiction. I deny defendants' request.

In her Amended Complaint, Saum asserts both 28 U.S.C. §§ 1331 and 1361 provide a jurisdictional basis for her claims. Section 1331 provides district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Section 1361 provides district courts with "original jurisdiction of any action in the nature of mandamus to compel an officer ... of the United States ... to perform a duty owed to plaintiff."

■ Federal jurisdiction exists if the complaint states a claim arising under federal law, even though on the merits the party may have no federal right. C. Wright, *Law of Federal Courts* at p. 62 (2d ed. 1970), *applied in Mindes,* 453 F.2d at 198. If a court is persuaded that federal law does not give the right the party claims, it is to dismiss for failure to state a claim rather than for want of jurisdiction. *Id.* Thus, dismissal for lack of subject matter jurisdiction is appropriate only if the federal claim is frivolous. *Id.*

■ Saum's claims are hardly frivolous. In her Amended Complaint, she identifies numerous instances where defendants violat-

ed her constitutional rights and failed to comply with regulatory duties owed her. *See* Am.Complaint at ¶¶ 33, 39, 44, 48–49, 84 (alleging noncompliance and failure to enforce punitive UCMJ articles, SERE rules, Academy rules and regulations, as well as federal rules and regulations prohibiting sexual harassment and hazing and governing investigations of rules violations). These claims arise under federal law and are sufficient to invoke this court's jurisdiction. *See Walden v. Bartlett,* 840 F.2d 771, 775 (10th Cir.1988) (district court had subject-matter jurisdiction over servicemember's constitutional claims against military under §§ 1331 and 1361) (applying *Bell v. Hood,* 327 U.S. 678, 681–82, 66 S.Ct. 773, 775–76, 90 L.Ed. 939 (1945)). As long as facts sufficient to invoke the court's jurisdiction are alleged, I "must entertain the suit." *Bell* at 681–82, 66 S.Ct. at 775–76.

## III. *AVAILABILITY OF REVIEW*

That I have subject-matter jurisdiction over Saum's claims does not mean they are reviewable. Because they are asserted against the Air Force and various Air Force officials, I must examine the substance of each in light of the strong policy reasons behind nonreview of military matters.

■ Under a judicial policy akin to comity, which, for lack of a better term I will call dissuasion, federal courts are reluctant to intervene in or review internal military affairs. *See Lindenau v. Alexander,* 663 F.2d at 70–71 (10th Cir.1981).

The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

*Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). Certain matters are so uniquely within the military's discretion that they are subject to civilian control only by the legislative and executive branches of government. In *Gilligan v. Morgan,* for example, plaintiffs sought review of the policies, training, weaponry, and operations of the Ohio National Guard after the infamous shootings at Kent State University.

Writing for the majority, Chief Justice Burger found plaintiffs' claims nonjusticiable:

> [I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.

█ Invoking *Gilligan*, defendants argue Saum's claims present a nonjusticiable political question because they seek review of the methods and manner in which the Air Force organizes, trains, equips, and commands its personnel. Mot.Dism. at 11. "What [Saum] asks," they assert, is for this court "to intervene in the determination of how to prepare the next F–16 pilot for the possibility of capture by an enemy." *Id.* at 13. They conclude there could be no "clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process".[6] *Id.* at 11.

█ It is beyond such cavil that civilian courts may review military matters when substantial constitutional rights are in jeopardy or when the military has acted in violation of applicable statutes or its own regulations. *See Lindenau* at 71, *applied in Clark v. Widnall*, 51 F.3d 917, 921 (10th Cir.1995). Thus, federal courts may review matters of internal military affairs (1) to determine whether military officials "acted outside the scope of [their] powers" or (2) "violat[ed] their own regulations"; (3) to "question[ ] the constitutionality" of statutes, executive orders, or regulations relating to the military; (4) to review court-martial convictions alleged to involve errors of "constitutional proportions" as well as (5) selective service induction procedures. *See id.* (citations omitted). Review is not permitted to "secondguess judgments requiring military expertise," "substitute court orders for discretionary military decisions," or where review "might stultify the military in the performance of its vital mission." *Mindes*, 453 F.2d at 199–201 (citations omitted).

While in *Lindenau* the Tenth Circuit ultimately declined to review plaintiff's administrative discharge from the National Guard, it adopted the two-part test for determining reviewability of military action articulated by the Fifth Circuit in *Mindes v. Seaman*, 453 F.2d at 201–02. As summarized by the Fifth Circuit in a later decision, the *Mindes* test

> requires a court contemplating review of an internal military determination first to determine whether the case involves an alleged violation of a constitutional right, applicable statute, or regulation, and whether intraservice remedies have been exhausted.[7] If so, the court is then to

---

6. This hyperbole, particularly the obvious reference to the recent downing of an Air Force pilot over Bosnia and his successful evasion of capture, is disingenuous to the extent it suggests that sexual assault and constitutional deprivations are acceptable and protected aspects of military training or that the issues raised are beyond the ken of the court. Unlike in *Gilligan*, Saum is not asking me to "assume continuing regulatory jurisdiction" over military training programs. *C.f. Gilligan*, 413 U.S. at 5, 93 S.Ct. at 2443 (plaintiffs' claims a "broad call" on judicial power to determine the appropriateness of, establish standards for, and exercise continuing surveillance over Ohio National Guard's training, weaponry and orders). Instead, she asks me to review specific past and ongoing conduct of defendants and fashion an equitable remedy correcting alleged wrongs done to her and ensuring defendants continue to comply with their own rules and regulations. Her claims "tread[ ] upon an area of expertise long conceded to the courts" and I reject the contention that review of defendants' actions must be left to the elected branches of government as so much posturing. *Steffan v. Aspin*, 8 F.3d 57, 62 (D.C.Cir.1993) (constitutionality of Naval Academy's treatment of homosexual midshipman). Further, the conduct of which Saum complains extends far beyond her experience during survival and evasion training. Saum alleges she was sexually harassed throughout her tenure at the Academy and identifies numerous incidents involving disparate treatment and discrimination based on sex that took place outside the context of SERE.

7. The exhaustion requirement should not, and does not appear to, apply to constitutional claims. *See Lindenau*, 663 F.2d at 72 (appellant met first part of *Mindes* test by alleging violation of her constitutional rights; review denied under second part of *Mindes* because alleged deprivations "were not strong"); *Coppedge v. Marsh*, 532 F.Supp. 423, 427 n. 3 (D.Kan.1982) (contention that plaintiff failed to exhaust intraservice remedies not determinative of due process claim's justiciability).

weigh the nature and strength of the challenge to the military determination, the potential injury to the plaintiff if review is refused, the type and degree of anticipated interference with the military function, and the extent to which military discretion or expertise is involved in the challenged decision.

*NeSmith v. Fulton,* 615 F.2d 196, 201 (5th Cir.1980), *quoted in Lindenau,* 663 F.2d at 71. Courts in this circuit have granted review where the constitutional or statutory claim is "serious" and the potential injury to plaintiff outweighs any interference with military functions. *E.g. Coppedge v. Marsh,* 532 F.Supp. 423, 427 (D.Kan.1982) (military chaplain's challenge of Army's authority to relieve him from active duty pending final appellate review of court-martial conviction reviewable, but action dismissed because due process and equal protection allegations failed to state a claim under Rule 12(b)(6)). They have denied review where plaintiff's claim is found to be weak in comparison with the preference against interference with the military. *See Lindenau,* 663 F.2d at 73 (none of plaintiff's constitutional challenges to facially neutral National Guard regulation "particularly strong"); *Costner v. Oklahoma Army National Guard,* 833 F.2d 905, 907–08 (10th Cir.1987) (no review of National Guard technician's statutory age and sex discrimination claims where rational basis for Guard's action "easily established"). Plaintiff bears the burden of demonstrating military officials have acted in a manner that would justify interference by a civilian court. *Clark v. Widnall,* 51 F.3d 917, 921 (10th Cir.1995) (no review where plaintiff failed to show dispute involved a cognizable constitutional right).

■ In the present case, Saum satisfies the first part of *Mindes* test both by alleging defendants targeted her for sexual harassment and abuse in violation of her constitutional rights, and by asserting they failed to comply with applicable statutes, rules and regulations. To the extent exhaustion of in-

tramilitary remedies is required under these circumstances, *c.f.* n. 7 *supra,* Saum asserts she did all she could, including meeting with the Secretary of the Air Force, before initiating this lawsuit and that any further administrative attempts to vindicate her rights would be futile. I agree.

Applying the remaining *Mindes* factors, I find the potential injury to Saum if review is declined great. Defendants' allegedly unconstitutional conduct would go unchecked and Saum would be unable to seek vindication of her civil rights. I also find the deference due the Air Force in the design and implementation of its educational and training programs does not prohibit review of a claim that, on a particular occasion, those programs were carried out in violation of the rules and regulations governing them or a participant's fundamental constitutional rights. *See Coppedge,* 532 F.Supp. at 427 (deference due military decisions does not prohibit review of constitutional and statutory authorization for them).

As the District of Columbia Circuit succinctly stated in *Steffan v. Aspin,* "[t]here is no 'military exception' to the Constitution." 8 F.3d at 62 (noting that when the Supreme Court has deferred to military judgment, it has been careful to do so only within the confines of ordinary constitutional analysis (citing *Rostker v. Goldberg,* 453 U.S. 57, 67, 101 S.Ct. 2646, 2653, 69 L.Ed.2d 478 (1981)), *rev'd on other grounds en banc sub nom. Steffan v. Perry,* 41 F.3d 677 (D.C.Cir.1994). The Fifth Circuit recognized the limits of such deference when it articulated the *Mindes* test, stating that while the Supreme Court requires general deference to military decisions, "[it] could not stay its hand if, for example, it [were] shown that only blacks were assigned to combat positions while whites were given safe jobs in the sanctuary of rear echelons." *Mindes,* 453 F.2d at 199.[8]

**8.** But compare *Chappell v. Wallace,* 462 U.S. 296, 304–05, 103 S.Ct. 2362, 2367–68, 76 L.Ed.2d 586 (1983), where the Supreme Court dismissed an action brought by enlisted servicemembers alleging racial discrimination in duty assignments and performance evaluations due to the "special" status of the military and the effect such a suit may have on military discipline. The distinction there, described in more detail in Section IV(A) *infra,* is that plaintiffs were asking the Court to imply a Bivens cause of action for damages in suits brought by individual servicemembers against their superiors. Applying the analysis required by *Bivens,* the Court found "special factors" counselled against implying such a cause of action in the military context.

The only remaining *Mindes* factor I must weigh is the nature and strength of Saum's constitutional and statutory claims. 453 F.2d at 201. If they are so weak as to render review futile, the balance will tip in favor of the Air Force and against review. *See Lindenau,* 663 F.2d at 72; *Mindes,* 453 F.2d at 201 ("[a]n obviously tenuous claim ... must be weighted in favor of declining review"). Accordingly, I consider whether Saum has stated a claim for relief under Fed.R.Civ.P. 12(b)(6).

### IV. *ANALYSIS UNDER RULE 12(b)(6)*

Saum alleges defendants targeted her for sexual harassment and abuse from the moment she entered the Air Force Academy because of her sex and appearance. She further alleges defendants failed to comply with or to enforce applicable statutes, rules and regulations prohibiting such conduct. Finally, Saum maintains defendants have failed, and continue to fail, to comply with or to enforce certain statutes, rules and regulations which govern the processing of her resulting complaints. Saum's 29–page Amended Complaint is replete with detailed examples both of the sexual harassment she claims to have suffered as well as the rules and regulations she claims defendants violated.

What is difficult to discern from the Amended Complaint, however, is the precise nature of Saum's claims and requests for relief. In essence, Saum claims defendants' conduct—both in targeting her for harassment and in failing to comply with rules and regulations prohibiting such conduct—violated her liberty, due process and equal protection rights under the United States Constitution. As Saum defines her relief, she seeks: (1) a declaratory judgment that her constitutional rights have been violated and restitution therefor; (2) a declaratory judgment that she is a "crime victim" as defined by 42 U.S.C. § 10606 and DOD Instruction No. 1030.2, Definition No. 5.a entitled to certain

rights and benefits, including restitution; (3) a preliminary and permanent injunction "enjoining [defendants] from failing to" (a) release "all information from their investigation of her reports," including the identities of her accused harassers and witnesses to the events of which she complains, and tapes and transcripts of witness interviews;[9] (b) accord her crime victim status with the "rights and benefits attendant to that status," including restitution; and (c) award her "such other relief as provided by law"; and (4) restitution under a theory of unjust enrichment.

### A. *Constitutional Claims*

■ In *Costner* the Tenth Circuit concluded plaintiff's age discrimination claims against the military were unreviewable because such claims are examined for a rational basis, "which the military could easily establish." 833 F.2d at 907. Saum's sex discrimination claims, by contrast, are subjected to close judicial scrutiny, which is not so easily satisfied. *See Frontiero v. Richardson,* 411 U.S. 677, 682, 93 S.Ct. 1764, 1768, 36 L.Ed.2d 583 (1973). The problem with Saum's constitutional claims is not with their viability on the facts but, as she concedes, with the availability in this case of any meaningful remedy.

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* the United States Supreme Court held that unless there were "special factors counselling hesitation" or an "explicit congressional declaration" that another remedy is exclusive, individuals may bring a claim for damages against government officials directly under the Constitution. 403 U.S. 388, 396, 91 S.Ct. 1999, 2004, 29 L.Ed.2d 619 (1971). The Court later found such "special factors" exist in actions brought by members of the military against their superiors, concluding the "unique disciplinary structure of the Military Establishment and Congress' activity in the field" dictated it would be "inappropriate" to provide such plaintiffs a Bivens-type remedy. *Chappell v.*

---

**9.** This request was the subject of a Motion for Temporary Restraining Order filed by Saum on May 26, 1995. After a hearing, defendants agreed to release the information requested pursuant to protective order. I signed the parties' Stipulated Protective Order on June 6, 1995, and documents were produced to Saum thereafter. Saum has not complained nor has there been

any suggestion that documents continue to be withheld. The protective order remains in effect and requires defendants to produce the information requested. The need for an order enjoining defendants "from failing to ... release to plaintiff all information from their investigation of her reports" is therefore in doubt.

*Wallace,* 462 U.S. 296, 300–04, 103 S.Ct. 2362, 2365–68, 76 L.Ed.2d 586 (1983) (referencing the "concern," expressed in *Feres,* "with the disruption of '[t]he peculiar and special relationship of the soldier to his superiors' that might result if the soldier were allowed to hale his superiors into court [citations omitted]").[10]

In an attempt to circumvent *Chappell,* Saum asks not for damages, but for equitable relief in the form of a declaratory judgment that defendants violated her constitutional rights "under *Bivens* and *Chappell,*" Am. Compl. at ¶ 71, and restitution "in an amount to be determined after hearing." *Id.* at ¶ 131. Relying on the Supreme Court's statement in *Chappell* that "[it] has never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service," 462 U.S. at 304, 103 S.Ct. at 2368, Saum contends equitable relief is always available against the military. Saum paints with too broad a brush.

▐ Where, as here, plaintiff seeks no prospective relief, the Declaratory Judgment Act is an inappropriate vehicle for asserting constitutional claims. The Act provides a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy, as well as in cases in which a party who could sue for coercive relief has not yet done so. *See generally* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2751, p. 569 (2d ed. 1983). The remedy is intended to minimize the danger of avoidable loss and the unnecessary accrual of damages, and to afford one threatened with liability an early adjudication without waiting until his adversary should see fit to begin an action after the damage has accrued. *Id.*

▐ Where the constitutional injury has already occurred and there is no threat of future harm, declaratory relief is inappropriate. *See Boston v. Lafayette County,* 744 F.Supp. 746, 755–56 (N.D.Miss.1990), *aff'd* 933 F.2d 1003 (5th Cir.1991) (declaratory relief unavailable in civil rights action arising from death of detainee where defendants immune from damages and no threat of future injury); *Hoagy Wrecker Serv. Inc. v. City of Ft. Wayne,* 776 F.Supp. 1350, 1359 (D.Ind. 1991) (Act unavailable to tow truck operator asserting equal protection claim against city in connection with award of contract to other operators; purpose of Act was to prevent the accrual of avoidable damages, and these had already occurred). As in *Boston* and *Hoagy,* the alleged deprivations in the instant case have already occurred. Saum does not contend the deprivations are ongoing or that she faces a threat of being harmed by them in the future.[11] Under these circumstances:

> [declaratory relief] would only serve to answer a hypothetical question of constitutional law, assuming a potential for future harm and that the doctrines barring recovery for damages did not apply. While a declaratory judgment in the plaintiff's favor might help ease the emotional loss [she] suffered as a result of [her sister's] death, due to the preclusion of damages and no risk of future harm, it "would [be] nothing more than a gratuitous comment without any force or effect."

*Boston,* 744 F.Supp. at 756 (internal quotes and citations omitted).

Saum's constitutional claims, however, could be viable if coupled with an appropriate request for relief. In *Frontiero,* for example, the Supreme Court reached the merits of a female servicemember's due process and equal protection claims when the relief sought was an increase in the benefits she

**10.** *But see Durant v. Neneman,* 884 F.2d 1350, 1352–53 (10th Cir.1989). In an opinion authored by Judge Porfilio, the Tenth Circuit in *Durant* undertook a thorough analysis of *Chappell* and the doctrine of intra-military immunity. Recognizing that *Chappell* has been extended to shield not only a military plaintiff's immediate superiors, but also anyone who "exercis[es] military authority," the Tenth Circuit nevertheless refused to extend it to shield individuals whose personal acts formed the basis for plaintiff's claim "when those acts in no way implicate the function or authority of the military." *Id.* at 1353.

**11.** Saum professes no intent to return to the Academy and therefore faces no threat of future harassment or abuse there. SERE no longer is part of undergraduate training at the Academy, and Saum would not have to participate in it even if she were to return.

alleged were discriminatorily allocated based on sex. 411 U.S. at 690–91, 93 S.Ct. at 1772–73. In *Walden,* 840 F.2d at 774, the Tenth Circuit found a military prisoner's due process claims reviewable on their merits where the relief sought was an injunction restoring good time credits, prohibiting summary transfer to segregation, and removal of specific officer from disciplinary board. In *Steffan v. Aspin,* 8 F.3d at 70, the District of Columbia Circuit reached the merits of a midshipman's claim that his dismissal from the Naval Academy was unconstitutional and ordered plaintiff reinstated to military service, awarded his diploma, and commissioned as an officer.

The question here is whether restitution was a form of relief the Supreme Court believed was available when it stated its holding in *Chappell* did not mean that "military personnel are barred from all redress in civilian courts for constitutional wrongs." In *United States v. Stanley,* 483 U.S. 669, 683, 107 S.Ct. 3054, 3063, 97 L.Ed.2d 550 (1987), the Court explained that "as the citations immediately following that statement suggest, it referred to redress designed to halt or prevent the constitutional violation rather than the award of money damages." *See Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (plaintiff sought relief from regulations requiring members of Air Force to obtain approval before circulating petitions on Air Force bases); *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (*habeas corpus* action brought by serviceman seeking relief from conviction under allegedly unconstitutional statute); *Frontiero,* 411 U.S. 677, 93 S.Ct. 1764 (1973) (plaintiff sought benefits she alleged were unconstitutionally denied her husband based on her sex). As set forth in the discussion regarding Saum's request for declaratory judgment, the relief she seeks is not designed for such prophylactic effect. Nor is it remedial in the sense the requests for injunctive relief in *Steffan* and *Walden* were. Other than vague references at oral argument to being awarded her diploma or commissioned an officer, the only relief Saum seeks is restitution in the form of a monetary award

reflecting "the value of the education" she would have received but for the alleged misconduct of defendants. There simply is no way to reconcile such a request with the prohibition against monetary awards stated in *Stanley.*

Based on the foregoing, Saum's constitutional claims are reviewable under the *Lindenau–Mindes* test only to the extent the equitable relief sought is in a form other than a monetary award.

### B. Claims for "Crime Victim" Status

In her Second and Third Claims for Relief, Saum seeks a declaratory judgment that she is a "crime victim" as defined by the Victims' Rights and Restitution Act of 1990 (the "Victims' Rights Act") and DOD Instruction No. 1032.2 and an order "enjoining" defendants "from failing to" accord her such status. The request is more appropriately viewed as an action in the nature of mandamus under 28 U.S.C. § 1361.[12] *See Carpet, Linoleum & Resilient Tile Layers Local 419 v. Brown,* 656 F.2d 564, 566–67 (10th Cir.1981) (relief in the form of a mandatory injunction is essentially in the nature of mandamus).

▪ Defendants argue Saum's claims should be dismissed because there is no private right of action under the Victims' Rights Act. The argument is without merit. Relief under § 1361 is available despite the lack of an implied right of action under the statute sought to be enforced. *Hernandez–Avalos et al. v. INS,* 50 F.3d 842, 846 (10th Cir.1995). For mandamus to issue, however, there must be a "clear and indisputable" right to the relief sought, a plainly defined and peremptory duty on the part of respondent to do the action in question, and no other adequate remedy available. *Johnson v. Rogers,* 917 F.2d 1283, 1285 (10th Cir.1990), *applied in Burkins v. United States,* 865 F.Supp. 1480, 1489 (D.Colo.1994).

▪ The Victims' Rights Act requires officers and employees of the Department of Justice and other departments and agencies of the United States "engaged in the detection, investigation, or prosecution of crime"

---

12. Section 1361 provides that federal courts "shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

to "make their best efforts" to see that victims are accorded certain identified rights. 42 U.S.C. § 10606. "At the earliest opportunity after the detection of a crime," a responsible official must "identify the victim" and inform her of her rights, including the availability of restitution or other relief, continuing information regarding the status of the investigation, as well as other forms of assistance. *Id.,* § 10607.

While Saum maintains defendants are legally obligated to accord her crime victim status, it is clear the government is not required to do anything under the Victims' Rights Act in the absence of an ongoing criminal investigation. Saum does not allege such an investigation has taken place. Out of an abundance of caution, however, I will not dismiss Saum's mandamus claims at this point in the proceedings. If Saum can establish the Beasley and Kinnan investigations were of a nature that triggered application of the Victims' Rights Act, or that the Air Force was required under the circumstances to have launched a criminal investigation of defendants' conduct, she may be entitled to the relief requested. Accordingly, Saum's request to be accorded "crime victim" status is reviewable under the *Lindenau–Mindes* test and defendants' motion to dismiss Saum's Second and Third Claims for Relief is denied.

### C. *Restitution—Unjust Enrichment*

██ Defendants do not address Saum's request for restitution under a theory of unjust enrichment in their motion to dismiss. I am therefore reluctant to consider the merits of such a claim under a Rule 12(b)(6) standard. I do note that restitution is available generally against "a[ny] person who has been unjustly enriched at the expense of another." *See* Restatement of Restitution

§ 1 (1937), *applied in United States v. Insurance Co. of North America,* 695 F.2d 455, 458 (10th Cir.1982). In order to state a claim for restitution, Saum must allege the Air Force received a benefit from her in the form of services performed, saved expense or some other form of advantage, the retention of which would be unjust. *Ibid.,* comments a, b & c. I find Saum's unjust enrichment claim subject to review under the *Lindenau–Mindes* test, but reserve judgment as to the sufficiency of Saum's allegations. Suffice it to say at this juncture that it was the Air Force that sought out Saum, not the other way around, by recruiting her after the application deadline had passed. This suggests the Air Force believed Saum's attendance at the Academy would benefit it in some way.[13]

## V. CONCLUSION

I have jurisdiction over Saum's claims against the *ex officio* defendants. Saum's claims that defendants targeted her for sexual harassment in violation of her constitutional rights and failed to comply with applicable statutes, rules and regulations prohibiting such conduct and governing the investigation of her complaints are reviewable under the *Lindenau–Mindes* test. Saum's constitutional claims are serious ones, involving the alleged deprivation of her fundamental rights. The potential injury if review is refused clearly outweighs any interference with military functions if review is granted. The deference due the Air Force in matters of training does not bar claims that, in this particular instance, defendants violated the rules and regulations governing such training or Saum's constitutional rights. Saum's claims tread on an area of expertise long conceded to the courts. They are not so weak that review in this case would be futile.

---

13. The benefits student-athletes confer on the institutions they attend have been the subject of several cases and academic writings in recent years. *See, e.g.,* Harold B. Hilborn, *Student–Athletes & Judicial Inconsistency: Establishing a Duty to Educate as a Means of Fostering Reform of Intercollegiate Athletics,* 89 Nw.U.L.Rev. 741 (1995); Timothy Davis, *Intercollegiate Athletics: Competing Models & Conflicting Realities,* 25 Rutgers L.J. 269 (1994). I note also discussions regarding the rights and obligations that arise out of the athlete-institution relationship, including the duties of care and equal education oppor-

tunity that may be imposed on the institution. Express obligations, too, may be inferred from representations made to student-athletes during the recruitment process, in financial aid packages and in National Collegiate Athletic Association (NCAA) Certification Reports. *See generally* Timothy Davis, *Student–Athlete Prospective Economic Interests: Contractual Dimensions,* 19 T.Marshall L.Rev. 585 (1994); Timothy Davis, *Absence of Good Faith: Defining a University's Educational Obligation to Student–Athletes,* 28 Hous.L.Rev. 743, 772–82 (1991).

The viability of Saum's constitutional claims turns on the nature of the relief requested. Saum's request for a declaratory judgment that her constitutional rights were violated fails to state a claim upon which relief can be granted. So too any request for restitution in the form of a monetary award based on a *Bivens* theory of relief must fail.

Saum's request in the nature of mandamus to be accorded "crime victim" status under 42 U.S.C. § 10606 and DOD Instruction No. 1032 is reviewable, states a valid claim and is not subject to dismissal under Rule 12(b)(6).

For the purposes of the instant motion, I find Saum's request for restitution under a theory of unjust enrichment likewise reviewable. If Saum establishes that defendants were unjustly enriched or profited by their own wrongs at her expense, she may be entitled to restitution as a matter of equity.

IT IS SO ORDERED.