**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 19 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

CUSTER COUNTY ACTION ASSOCIATION;
NATIONAL AIRSPACE COALITION; OPEN
SPACE ALLIANCE; THE WILDERNESS
SOCIETY; BOARD OF DIRECTORS OF MOFFAT
CONSOLIDATED SCHOOL DISTRICT NO. 2;
CUSTER COUNTY AIRPORT AUTHORITY;
FREMONT COUNTY AIRPORT; THE BOARD OF
THE TOWN OF CRESTONE; THE BOARD OF
COUNTY COMMISSIONERS OF CUSTER
COUNTY; THE BOARD OF COUNTY
COMMISSIONERS OF FREMONT COUNTY,
COLORADO; THE BOARD OF COUNTY
COMMISSIONERS OF SAGUACHE COUNTY,
COLORADO; THE SPIRITUAL LIFE INSTITUTE;
LA VETA PEACE OF AIR ALLIANCE;
CRESTONE MOFFAT BUSINESS ASSOCIATION;
HUERFANO VALLEY CITIZENS ALLIANCE;
RURAL ALLIANCE FOR MILITARY
ACCOUNTABILITY; WOLF SPRINGS RANCHES,
INC.; THE HISTORIC PINES RANCH; CUSTER
COUNTY BISON; KAREN G. WORONOFF;
DAVID S. WORONOFF,

      Petitioners,

v.

JANE F. GARVEY, as Administrator of the
FEDERAL AVIATION ADMINISTRATION; and
UNITED STATES AIR FORCE MAJOR GENERAL
PAUL A. WEAVER, Jr., as Director of the AIR
NATIONAL GUARD,

      Respondents.

No. 99-9543

**Appeal from the Federal Aviation Administration
and the Air National Guard**

Brian B. O'Neill (Michael A. Ponto, Elizabeth H. Schmiesing, and Michael D. Beach of Faegre & Benson LLP, Minneapolis, Minnesota; and Colin C. Deihl of Faegre & Benson LLP, Denver, Colorado, with him on the briefs) of Faegre & Benson LLP, Minneapolis, Minnesota, for Petitioners.

Ronald M. Spritzer (Lois J. Schiffer, Assistant Attorney General; M. Alice Thurston, Department of Justice; Hans I.E. Bjornson, Federal Aviation Administration; and Randy Chambers, National Guard Bureau, with him on the brief), Department of Justice, Washington, D.C., for Respondents.

Before **SEYMOUR**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **BROWN**,[*] District Judge.

**BRORBY**, Senior Circuit Judge.

Petitioners ask us to reverse the Federal Aviation Administration's (FAA) and Air National Guard's (ANG) orders approving the Colorado Airspace Initiative (Initiative) and finding adequate the Final Environmental Impact Statement on the Initiative. They claim the orders approving the Initiative and the underlying environmental impact analysis violate the Federal Aviation Act, 49 U.S.C. § 40103(b)(3), and the National Environmental Policy Act, 42 U.S.C. §§ 4321 - 4370(e). Petitioners further claim implementation of the Initiative will

---

[*] The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

violate their property rights under the Third and Fifth Amendments to the United States Constitution.

We exercise jurisdiction over the FAA's final order pursuant to 49 U.S.C. § 46110. *National Parks & Conservation Ass'n v. Federal Aviation Admin.*, 998 F.2d 1523, 1528-29 (10th Cir. 1993) supports extending our review to the ANG's decision and final environmental impact statement as incorporated into the FAA's final decision. Having carefully reviewed the administrative record,[1] and for the

_____

[1] Petitioners have requested to supplement the administrative record with numerous additional documents, including affidavits, newspaper articles, U.S. Census Bureau population estimates, and a "preliminary Draft" of a "Generic Environmental Impact Statement for Air Force Low Altitude Flying Operations." Respondents oppose this request, except as to the tape and transcript attached to the Affidavit of Elizabeth A. Boike, which they agree represents an accurate transcription of a meeting that was part of the administrative process.

Judicial review of an agency decision is generally limited to review of the administrative record. *See Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976); *accord Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 433 n.7 (10th Cir. 1996). The circumstances which warrant consideration of extra-record materials are "extremely limited." *American Mining Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985) (listing possible justifications as: (1) the agency action is not adequately explained and cannot be reviewed properly without considering the cited materials; (2) the record is deficient because the agency ignored relevant factors it should have considered in making its decision; (3) the agency considered factors that were left out of the formal record; (4) the case is so complex and the record so unclear that the reviewing court needs more evidence to enable it to understand the issues; and (5) evidence coming into existence after the agency acted demonstrates the actions were right or wrong), *cert. denied*, 476 U.S. 1158 (1986). The narrow conditions warranting an exception to the general rule are not present in this case.

-3-

reasons set forth below, we deny the Petition for Review.

BACKGROUND

This dispute was triggered by the Colorado Airspace Initiative – proposed special use airspace changes to the National Airspace System designed to: (1) provide the necessary airspace for the 140th Tactical Fighter Wing of the Colorado ANG to be able to train with the F-16 fighter jet under realistic conditions; and (2) respond to changes in commercial aircraft arrival and departure corridors required for operation of Denver International Airport.

The Colorado ANG is under the command and control of the Governor of Colorado and is also a reserve component of the United States Air Force. ANG units have increased as a percentage of the total military force and thus have assumed a more prominent role in our national defense. For example, the 140th Air Wing has assisted in Operation Northern Watch, enforcing the no-fly zone in northern Iraq, Operation Southern Watch, enforcing the no-fly zone in southern Iraq, and in operation Coronet Night Hawk, intercepting drug runners from Colombia. The Air Force provides the F-16 fighter and other weapon systems to

Accordingly, we deny Petitioners' motion to supplement the record, except for the unopposed affidavit of Elizabeth A. Boike.

the ANG. Those systems must be maintained and utilized pursuant to Air Force and Department of Defense regulations. 32 U.S.C. § 701, *et seq.* The ANG's need for frequent, realistic training exercises using these systems is obvious.

ANG pilots utilize three types of airspace in conducting their training exercises: Military Training Routes (MTRs),[2] Military Operations Areas (MOAs),[3] and Restricted Areas (RAs).[4] As finally approved, the Initiative involved a total of fourteen modifications to MTR and MOA airspace in Colorado. The FAA groups these modifications into four actions:

    1. Kit Carson MOA – This has been renamed the Cheyenne

---

[2] "A MTR is a long, low-altitude corridor that serves as a flight path to a particular destination. A standard MTR usually ranges from 500 feet to 1,500 feet above ground level." "MTRs are designed to provide military pilots with training routes to practice navigational skills over a variety of terrain types and provide access to MOAs, air-to-ground gunnery ranges, and other destinations."

[3] "MOAs are larger expanses of airspace designed to accommodate a wide variety of nonhazardous military flight training maneuvers. The size of a MOA depends on the types of air maneuvers that occur within the MOA. The maximum altitude for a MOA is 17,999 feet above mean sea level. MOAs are not created to prevent access by other aircraft, but rather to show civil aircraft pilots where nonhazardous military flight training may be taking place." "MOAs are typically only scheduled a few hours a day and are not in continuous daily use."

[4] "A RA is usually reserved for training involving either ground- or air-based weapons. These areas are restricted to ensure the safety of aircraft – both military and civilian – not participating in the training exercise."

MOA.  It retains roughly the same dimensions as the Kit Carson MOA, except that the FAA directed that the western boundary be shortened approximately 10 nautical miles in order to accommodate new approaches to the Denver International Airport.  The minimum flying altitude was raised from 100 feet to 300 feet above ground level.

> 2.  Pinon Canyon MOA and Two Buttes MOA – This is the most significant change found in the [Initiative].  While the Pinon Canyon MOA was already in existence, the Two Buttes MOA is new.  The Two Buttes MOA abuts the eastern edge of the Pinon Canyon MOA to create one large MOA.  The Two Buttes MOA is large enough to handle F-16 fighters engaged in air-to-air combat training missions.  The Pinon Canyon MOA is used primarily for close-air-support training.

> 3.  Fremont MOA – This MOA was divided into three parts, named the Airburst A, B, and C MOAs.  The original MOA was enlarged at some points and reduced at others.  The modifications allow more realistic training opportunities for aircraft utilizing the existing Airburst range.  That portion of the Airburst MOA that leads to the Airburst Range has a minimum altitude of 500 ft. above ground level ....  The minimum altitude of the rest of Airburst MOA will remain the same as when it was the Fremont MOA, 1,500 ft. [above ground level].

> 4.  MTRs into, out of, and through MOAs – All other airspace modifications within the [Initiative] address how aircraft are to get to and from the MOAs listed above.  The previous MTRs had no minimum altitude restrictions.  Under the [Initiative], all MTRs will be raised to either 300 feet or 500 feet above ground level.  A number of MTRs were narrowed by the FAA as part of its environmental mitigation.

According to the FAA,

> [t]he remaining MOA, La Veta, is unchanged from its previous use, except the FAA deleted a small portion for the benefit of the Fremont County Airport.  Although some of the [Initiative] airspace is charted down to 300 feet above ground level, that airspace will

not be flown lower than 500 feet [above ground level] 'expect [sic]
in national emergencies or [for] special training requirements.'"

The ANG issued its record of decision adopting the above-referenced
changes, identified as the "preferred alternative" in the Final Environmental
Impact Statement, in October 1997. 62 Fed. Reg. 60487 (Nov. 10 1997). In
October 1999, the FAA issued a final order (1) adopting the Final Environmental
Impact Statement the ANG prepared on the Initiative, and (2) directing that the
requested Special Use Airspace changes to the National Airspace System
identified as the preferred alternative in the Final Environmental Impact
Statement be implemented. 64 Fed. Reg. 54721 (Oct. 7, 1999). Petitioners filed
their Joint Petition for Review of the ANG and FAA orders in November 1999.

STANDARD OF REVIEW

The Administrative Procedure Act, 5 U.S.C. § 706, governs our review of
the ANG's [5] and FAA's final decisions. *See Arapahoe County Pub. Airport Auth.
v. Federal Aviation Admin.*, 242 F.3d 1213, 1218 (10th Cir. 2001). We will set
aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or

---

[5] The Department of Defense, including the Airforce and KNG, is not
excepted from National Environmental Policy Act requirements. *See Jackson
County v. Jones*, 571 F.2d 1004, 1007 (8th Cir. 1978).

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). [6] In determining whether an agency's decision is arbitrary or capricious, we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (quotation marks and citation omitted).

The agencies' findings of fact are conclusive if supported by substantial evidence. 49 U.S.C. § 46110(c); *see also Wyoming Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000). The substantial-evidence standard does not allow us to displace the agencies' "'choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Arapahoe County Pub. Airport Auth.*, 242 F.3d at 1218 (quoting *Wyoming Farm Bureau Fed'n*, 199 F.3d at

---

[6] More specifically, a reviewing court may set aside an agency determination pursuant to 5 U.S.C. § 706(2) if it is (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (d) without observance of procedure required by law; (e) unsupported by substantial evidence; or (f) unwarranted by the facts to the extent they are subject to de novo review. 5 U.S.C. § 706(2); *see Lewis v. Babbitt*, 998 F.2d 880, 881-82 (10th Cir. 1993).

1231).

We review Petitioners' constitutional claims de novo.    *See Trimmer v. United States Dep't of Labor*  , 174 F.3d 1098, 1102 (10th Cir. 1999).


ANALYSIS

Petitioners raise an indiscriminate number of statutory and constitutional challenges to the ANG and FAA decisions approving the Initiative.  First, they claim the FAA violated the Federal Aviation Act, 49 U.S.C. § 40103(b)(3)(A), FAA regulations and the Administrative Procedure Act

> by implementing the [Initiative]:  (a) without determining whether the Initiative is necessary in the interest of national defense; (b) without record evidence to support such a conclusion; (c) in the face of substantial evidence that the Initiative is not necessary in the interest of national defense; (d) without accurate information with which it could determine whether the ANG has been using the minimum amount of airspace necessary; and by unlawfully delegating its authority to set minimum altitudes of flight to the military[.]

Second, Petitioners claim the ANG and FAA violated the National Environmental Policy Act, 42 U.S.C. §§ 4321      *et seq* ., and its implementing regulations, 40 C.F.R. §§ 1500.1-1508.28,

> by adopting an [Environmental Impact Statement] that:  (a) fails to adequately analyze the noise impacts of the Initiative; (b) omits analysis of the cumulative impacts of the [Initiative] and other

airspace use in the region; (c) omits analysis of the impacts of military overflights on Wilderness Areas, proposed wilderness, national monuments, and proposed national parks; (d) omits analysis of the nationwide impacts of military airspace proliferation; (e) fails to accurately and adequately analyze socioeconomic and growth-related impacts; and (f) fails to consider reasonable alternatives[.]

Finally, Petitioners argue the ANG and FAA violated the Fifth Amendment of the United States Constitution by taking Petitioners' property interests without due process of law, and violated the Third Amendment by appropriating Petitioners' property interests and invading Petitioners' privacy for military purposes during peacetime without their consent. We address each claim in turn.

### *Federal Aviation Act Claims*

#### Justiciability

The FAA asserts its decision the Initiative is necessary in the interest of national defense, made in consultation with the Department of Defense, is not subject to judicial review, "because it is a political question committed by the Constitution to the legislative and executive branches of government." Whether the political question doctrine restricts our review of this matter is a question of law we determine de novo. *See Adkins v. United States*, 68 F.3d 1317, 1322 (Fed. Cir. 1995).

-10-

The political question doctrine employs separation of powers principles to restrict the justiciability of certain issues. *See Aktepe v. United States*, 105 F.3d 1400, 1402-03 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998). Matters closely related to foreign policy and national security, for example, "are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981). Similarly, courts afford the political branches of government a particularly high degree of deference in the area of military affairs, because the Constitution expressly confers authority over the military on the executive and legislative branches. *Aktepe*, 105 F.3d at 1403 (citing U.S. Const. art. I, § 8, cls. 11-16; U.S. Const. art. II, § 2); *Clark v. Widnall*, 51 F.3d 917, 921 (10th Cir. 1995). We do not hesitate, however, to review military action (1) to determine whether military officials have acted within the scope of their powers, (2) to determine whether military officials violated their own regulations, (3) to evaluate the constitutionality of statutes pertaining to the military, or (4) to evaluate the constitutionality of court-martial convictions and selective service induction procedures. *Clark*, 51 F.3d at 921; *see also Mindes v. Seaman*, 453 F.2d 197, 200-01 (5th Cir. 1971).

We recognize the action at issue here technically is not military action. The FAA is a civilian agency. By statute, however, the FAA is instructed to

-11-

determine whether airspace is necessary to national defense in consultation with the Defense Department. 49 U.S.C. § 40103(b)(3). Under these circumstances, we believe the political question doctrine precludes us from second-guessing or interfering with the FAA's decision the Initiative is necessary to provide airspace for military training. *See Gilligan v. Morgan*, 413 U.S. 1, 5-11 (1973) (holding issues of National Guard training and weaponry are essentially professional military judgments within the constitutionally vested responsibility of the legislative and executive branches, and outside the courts' competence). However, we are free to review whether, in making that decision, the FAA acted within the scope of its powers, followed its own regulations, and complied with the Constitution. *Clark*, 51 F.3d at 921. We proceed, then, to evaluate Petitioners' claims to the extent they raise issues within these permissible review parameters. [7]

---

[7] While phrased as questions of administrative law, Petitioners' claims (1) no record evidence supports a decision the Initiative is necessary for national defense, (2) substantial evidence exists to show the Initiative is not necessary for national defense, and (3) the FAA used inaccurate information concerning the minimum amount of airspace necessary for ANG training, in truth attack the substance of the FAA's necessity determination. Petitioners really are asking this court to conclude the Initiative is not necessary in the interest of national defense. For the reasons stated above, we will not delve into the correctness of that determination.

## Findings of Necessity

Petitioners claim the FAA violated the Federal Aviation Act by failing to determine whether the Initiative is necessary in the interest of national defense. Petitioners are correct that 49 U.S.C. § 40103(b)(3)(A) directs the FAA to establish airspace areas it deems necessary in the interest of national defense. However, they overlook the specific purpose for that determination as set forth in § 40103(b)(3)(B): if, using "available facilities," the Administrator "cannot identify, locate, and control" civil aircraft in those areas deemed necessary for national defense, the Administrator shall restrict or prohibit civil aircraft flight in those areas by regulation or order.

As the FAA points out, by definition, MTRs and MOAs do not restrict or prohibit civil aircraft access. *See supra* notes 2-3 and accompanying text. Arguably then, 49 U.S.C. § 40103(b)(3)(A) does not apply to the FAA's approval of modifications to MTR and MOA airspace in Colorado. However, even if 49 U.S.C. § 40103(b)(3) does apply to some portion of the Initiative as approved by the FAA, nothing in that statute mandates that the FAA make an express finding of necessity. In the absence of a specific statutory directive, the law does not always require an agency to make formal findings. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417 (1971), *abrogated on other*

-13-

*grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *cf. Southwestern Bell Mobil Sys., Inc. v. Todd*, 244 F.3d 51, 59 (1st Cir. 2001) (finding no basis in language of Telecommunications Act to require formal findings of fact and conclusions of law from local zoning board); *AT&T Wireless PCS, Inc. v. City of Virginia Beach*, 155 F.3d 423, 429-30 (4th Cir. 1998) (stating Congress knows how to require formal findings when it so desires as evidenced by Administrative Procedure Act and certain provisions of Telecommunications Act). Moreover, the FAA's approval of the Initiative does not constitute an agency rulemaking or adjudicative action for which the Administrative Procedure Act requires formal findings. *See* 5 U.S.C. §§ 553(a)(2), 554(a). Most important, the record here amply demonstrates the FAA did, in fact, believe the Initiative to be necessary in the interest of national defense, and articulated the reasons why. Petitioners' arguments to the contrary simply are not supported by applicable law or the record.

<u>Limiting Military Airspace</u>

Consistent with the purpose of the Federal Aviation Act to "encourage and allow maximum use of the navigable airspace by civil aircraft," 49 U.S.C. § 40103(b)(3), the FAA is instructed to minimize the amount of airspace designated as special use airspace and to limit military airspace to the area

-14-

actually needed for training. *See e.g.,* FAA Order 7610.4J ¶ 9-1-4 (stating that special use airspace designations "shall be limited to the minimum number of areas necessary," and special use area activation "shall be limited to the minimum area, altitude, and time required for the activity/mission"). Petitioners argue the FAA violated its own policy. They further assert "the FAA appears to have improperly delegated [its authority to limit the amount of special use airspace] to the military." The record belies these claims.

The record shows the FAA reduced the special use airspace the ANG initially requested. Some reductions were incorporated at the FAA's request prior to the ANG issuing its record of decision. Others were incorporated as the FAA formally reviewed the ANG record of decision and National Environmental Policy Act documents. The FAA further restricted the hours military training could take place within the special use areas. This evidence that the FAA independently reviewed and modified the Initiative consistent with established FAA policy to minimize the area, altitude and time allotted to military training defeats Petitioners' unsubstantial claims the agency violated that policy and improperly delegated its authority. [8]

---

[8] In a related argument, Petitioners assert the FAA failed to keep factual data on the ANG's Colorado airspace usage. Petitioners believe the FAA improperly deferred to the ANG's inaccurate sortie counts – "[a] sortie consists of

Minimum Flight Altitudes

Minimum safe altitudes are established by regulation. 14 C.F.R. § 91.119. The general flight rule regulation specifically proscribes the operation of aircraft "closer than 500 feet to any person, vessel, vehicle, or structure" over open water or sparsely populated areas; the operation of aircraft closer than 500 feet above the surface in areas other than congested areas; and the operation of aircraft below "an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft" over "any congested area of a city, town or settlement, or over any open air assembly of persons." 14 C.F.R. §§ 91.119 (b),

---

the take-off, all the training events performed while in flight, and landing of a single aircraft"– which made "the Initiative falsely appear to be the 'environmentally preferred alternative.'" According to Petitioners, this "reliance ... on conjecture rather than factual data renders any 'implicit' determination that the Initiative contains the minimum areas and airspace use necessary entirely unreliable, in violation of FAA regulations."

In support of these allegations, Petitioners cite two documents – an informal, undated memo to "Doug" from "Kent" regarding ANG flying hours, and a table of 1992-93 baseline sortie data. These isolated references to the use of estimations or averages to quantify certain subsets of special uses (*i.e.*, sorties and MTRs) for certain years (FY 91, FY 93, FY 94), without any context to determine if or how the FAA used this information, simply do not support the proposition that the FAA utterly failed to monitor the ANG's use of Colorado airspace in accordance with FAA regulations and established policy.

It is more accurate to characterize Petitioners' complaints regarding the sortie data as a challenge to the adequacy of the Final Environmental Impact Statement. To the extent the baseline sortie data is relevant to Petitioners' National Environmental Policy Act claims, it is discussed *infra*.

(c). The Final Environmental Impact Statement indicates low altitude airspace within the Initiative will "be charted to 300 feet above ground level, but not flown lower than 500 feet above ground level except in national emergencies or special training requirements." Petitioners cite this statement as evidence the FAA violated its own regulations by charting airspace below the minimum altitudes prescribed by 14 C.F.R. § 91.119. Citing FAA Order 7610.4J ¶ 11-4-3, Petitioners further claim the FAA has unlawfully delegated its power to define minimum safe altitudes to the military. Neither claim withstands scrutiny.

First, as Respondents correctly point out, 14 C.F.R. § 91.119 does not set an absolute minimum altitude of 500 feet. Indeed, the regulation specifies no minimum altitude for flight over open water or sparsely populated areas so long as the aircraft is no "closer than 500 feet to any person, vessel, vehicle, or structure." 14 C.F.R. § 91.119 (c). Most MOAs and MTRs are located in sparsely populated areas, thus allowing a military pilot to fly below an altitude of 500 feet in a remote MTR or MOA and still be within navigable airspace, under the conditions permitted by the regulation.

Second, we agree with Respondents this is not the appropriate time or place for Petitioners to challenge the legality of FAA Order 7610.4J, which

addresses all "Special Military Operations," and is not specifically related to the

FAA's approval of the Initiative. We also agree with Respondents that to the

extent FAA Order 7610.4J permits the military to establish appropriate altitudes,

it does so under very narrow circumstances and does not constitute the wholesale

abrogation of authority Petitioners suggest. Contrary to granting blanket

permission to the military to disregard minimum safe altitude regulations, Order

7610.4J holds military pilots responsible for adhering to the provisions of 14

C.F.R. § 91.119 when flying instrument rule ("IR") and visual flight rule

("VFR") routes. FAA Order 7610.4J ¶¶ 11-6-7, 11-7-3(c). Only in the event of

an aircraft systems failure may the military establish an altitude suitable for flight

in instrument meteorological conditions (the IFR altitude) "contrary to 14 C.F.R.

[§ ] 91.119." FAA Order 7610.4J ¶ 11-4-3.b. "In no case will flight operations

be conducted at altitudes less than those specified in 14 C.F.R. § 91.177

[Minimum altitudes for IFR operations.]." *Id.* These circumstances provide no

basis for setting aside the FAA's decision approving the Initiative.

Finally, notwithstanding Congress' general intent that a civilian agency –

the FAA – regulate navigable airspace, *see* 49 U.S.C. § 40103(b), Congress

expressly gave the FAA broad authority to grant exemptions from safety

regulations, including minimum safe altitudes, "when the Administrator decides

the exemption is in the public interest." 49 U.S.C. § 40109(b). Petitioners have failed to show how the FAA has exceeded that authority if indeed it has exempted the ANG from the general minimum altitude requirements.

For all these reasons, within the limited permissible scope of appellate review, we conclude the FAA has not violated the Federal Aviation Act, FAA regulations or the Administrative Procedure Act by approving the Initiative.

### *National Environmental Policy Act Claims*

As we have stated on numerous occasions, the National Environmental Policy Act "prescribes the necessary process" by which agencies must take a "hard look at the environmental consequences of proposed actions utilizing public comment and the best available scientific information;"[9] it "does not

---

[9] The National Environmental Policy Act directs all federal agencies to:

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on –
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

mandate particular results." *Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1171-72 (10th Cir. 1999) (quotation marks and citations omitted); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1521-22 (10th Cir. 1992). In other words, the National Environmental Policy Act "'prohibits uninformed – rather than unwise – agency action.'" *Colorado Envtl. Coalition*, 185 F.3d at 1172 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)).

Petitioners' National Environmental Policy Act claims generally attack the adequacy of the Final Environmental Impact Statement, prepared by the ANG and adopted by the FAA. [10] Consistent with the intended purpose of the Act to prescribe a process by which agencies can make informed decisions, when we

---

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C) (listing the requirements for an environmental impact statement); *see also* 40 C.F.R. § 1500 *et seq*. (Council on Environmental Quality regulations expanding upon the appropriate form and content of an environmental impact statement.)

[10] "An agency may adopt a Federal draft or final environmental impact statement ... provided that the statement ... meets the standards for an adequate statement under [the Council on Environmental Quality] regulations." 40 C.F.R. § 1506.3(a).

review the adequacy of a final environmental impact statement

> we merely examine "whether there is a reasonable, good faith, objective presentation of the topics [the National Environmental Policy Act] requires an [environmental impact statement] to cover." *Holy Cross*, 960 F.2d at 1522 (quotation marks and citation omitted). Our objective is not to "fly speck" the environmental impact statement, but rather, to make a "pragmatic judgment whether the [environmental impact statement]'s form, content and preparation foster both informed decision-making and informed public participation." *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987) (quotation marks and citation omitted).

*Colorado Envtl. Coalition*, 185 F.3d at 1172.


Impact Analysis

"An environmental impact statement must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts of 'past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.'" *Id.* at 1176 (quoting 40 C.F.R. § 1508.7); *see also* 40 C.F.R. §§ 1508.8 (including ecological, aesthetic, historical, cultural, economic, social and health impacts) and 1508.25(a)(2), (c). Petitioners claim the environmental impact statement studying the Initiative failed to adequately address noise impacts; the cumulative impacts of all U.S. military, foreign military and non-military overflights; impacts to existing and proposed wilderness areas and national parks; the nationwide impacts of low-level military aircraft operations; and the

-21-

socioeconomic impacts of overflights. We examine the merits of each of these claims, combining our discussion of the cumulative and nationwide impacts.

*Noise*

Petitioners assert the ANG employed a flawed methodology that resulted in severely understated noise impacts. They support this claim, in part, with a collection of comments from United States Air Force noise analyses unrelated to the Initiative, including a 1987 Environmental Noise Assessment for Aircraft Training Routes and a December 1990 "Preliminary Draft" of a "Generic Environmental Impact Statement for Air Force Low Altitude Flying Operations." [11]

The administrative record establishes that the ANG and FAA performed a detailed analysis of the Initiative's potential noise impacts, using the Onset Rate Adjusted Monthly Day-Night Average Sound Level methodology – a cumulative sound metric that accounts for the sound level, duration, and frequency of noise producing events, and is "generally designed to determine the potential of noise to interfere with human activity." *Morongo Band of Mission Indians v. Federal*

---

[11] The Air Force never adopted this latter document as final. Moreover, it is not a part of the administrative record in this case.

*Aviation Admin* ., 161 F.3d 569, 577 n.2 (9th Cir. 1998). The agencies also employed the "sound exposure level" (SEL) metric to represent the intensity and duration ( *i.e.*, sound impact) of a specific noise event such as a single aircraft overflight. The Final Environmental Impact Statement illustrates that these particular methodologies are well-established and widely accepted.

It is true, not all commenters agreed with the ANG's and FAA's methodology or conclusion the Initiative would result in no significant noise impact. The Final Environmental Impact Statement considered these comments and incorporated them into the final analysis. For example, the agencies responded to concerns over using a sixty-five decibel noise threshold in rural areas by lowering that threshold to fifty-five decibels in certain areas and by expanding the noise criteria used to evaluate impacts in each affected area. The Final Environmental Impact Statement also included a discussion of the concept of natural quiet as a resource, additional information concerning the relative noise impacts in rural settings, and maps displaying noise contours for airspace impacted by the Initiative. The conclusions reached in the Final Environmental Impact Statement are based on data gathered by, and the reasoned opinions of, recognized experts. As we have stated before, "agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious."

*Colorado Envtl. Coalition*, 185 F.3d at 1173 n.12; *see also Morongo Band of Mission Indians*, 161 F.3d at 577; *City of Bridgeton v. Federal Aviation Admin.*, 212 F.3d 448, 459 (8th Cir. 2000) (recognizing, in upholding FAA's noise methodology used to analyze impacts of proposed airport expansion, "[t]he agency, not a reviewing court, is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances" (quotation marks and citations omitted)), *cert. denied*, 121 S. Ct. 855 (2001).

As so often is the case in disputes concerning the potential environmental impacts of a project, Petitioners' claim boils down to a disagreement over scientific opinions and conclusions. While we appreciate Petitioners' concerns over noise impacts, and do not ignore the fact contradictory evidence and data may well exist, "the mere presence of contradictory evidence does not invalidate the [a]gencies' actions or decisions." *Wyoming Farm Bureau Fed'n*, 199 F.3d at 1241. We cannot displace the agencies' choice between two conflicting views, even if we would have made a different choice had the matter been before us de novo. *Arapahoe County Pub. Airport Auth.*, 242 F.3d at 1218. Petitioners' technical objections do not demonstrate the ANG's and FAA's noise impact analysis was unsupported by substantial evidence in the administrative record,

inadequate to foster informed public participation and decision-making, or otherwise arbitrary and capricious. Nor do the objections support Petitioners' belated argument that a Supplemental Environmental Impact Statement is necessary. This claim therefore provides no basis for setting aside the Final Environmental Impact Statement. *See City of Bridgeton*, 212 F.3d at 460 (citing cases in which courts have upheld the FAA's discretion to choose its noise impact methodology).

*Cumulative / Nationwide*

Petitioners further challenge the adequacy of the Final Environmental Impact Statement insofar as it addresses cumulative impacts. They argue the ANG and FAA failed to analyze all impacts of both military (domestic and foreign) and non-military overflights in areas affected by the Initiative. In addition, they claim the ANG and FAA were required to prepare a comprehensive, programmatic environmental impact statement "to consider the impact of the nationwide proliferation of military airspace" and low-level military aircraft operations.

While we do not find the cumulative impact analysis to be a model of clarity or thoroughness, the Final Environmental Impact Statement does (1) list

anticipated sorties and time spent at each altitude band by the 140th, 27th, and 150th fighter wings, as well as "other" military aircraft; (2) apply the aircraft type and flying altitude data in evaluating the noise impacts; and, perhaps most important, (3) explain why the number of sorties are reasonably considered the key component of the cumulative impact analysis. The Final Environmental Impact Statement further explains how the noise prediction methodology accounts for both Initiative Activity and non-Initiative Activity in each area likely to be affected by the activities in a particular MOA or MTR, and how the agencies derived and applied a worst-case analysis based on the maximum number of aircraft operations within each region of influence. Commercial and non-military flight activity is neither related to nor dependent on the Initiative – Petitioners make no showing such activities, and thus any noise impacts from such activities, are likely to increase as a result of the Initiative. As such, those activities need not be analyzed as direct or indirect cumulative impacts caused by the Initiative. *See Allison v. Department of Transp.*, 908 F.2d 1024, 1031 (D.C. Cir. 1990); *C.A.R.E. Now, Inc. v. Federal Aviation Admin*., 844 F.2d 1569, 1574-75 (11th Cir. 1988). As to the possible impact of more military pilots flying off course (*i.e.*, pilot noncompliance or misconduct), it was noted recent compliance had been "extremely good," and the agencies identified and implemented a mitigation measure to minimize any such impact. The National Environmental

Policy Act requires nothing more. *See Park County Resource Council v. United States Dep't of Agric.*, 817 F.2d 609, 621-22 (10th Cir. 1987), *overruled on other grounds by Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992). For these reasons, we hold the cumulative impact analysis in the present case is legally sufficient. *Cf. Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976) ("determination of the extent and effect of [cumulative impacts on range of resources], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies").

We further hold the Initiative is not a "connected action," triggering the need for a programmatic or nationwide environmental impact analysis. Put simply, projects that have "independent utility" are not "connected actions" under 40 C.F.R. § 1508.25(a)(1)(iii). The administrative record makes clear the Initiative has independent utility. The Initiative was designed specifically to provide the necessary airspace for the 140th Tactical Fighter Wing of the Colorado ANG to be able to train with the F-16 fighter jet under realistic conditions, and to make changes in commercial aircraft arrival and departure corridors required for operation of the new Denver International Airport. The record gives no indication, and Petitioners cite no evidence, of a clear nexus

between the Initiative and other military airspace proposals across the Nation. In the absence of such evidence, it is neither unwise nor irrational to allow the Initiative to go forward independent of other special use airspace designations or low-level military flight training programs. *See Airport Neighbors Alliance, Inc.*, 90 F.3d at 430-31 (holding no cumulative environmental impact statement was required where no "inextricable nexus" existed between runway upgrade and airport development master plan, and where proposed runway upgrade was independent from other Master Plan components); *see also Morongo Band of Mission Indians*, 161 F.3d at 579-80; 46 Fed. Reg. 18026, 18033 (Mar. 23, 1981) (explaining that an area-wide or overview environmental impact statement is "useful when similar actions, viewed with other reasonably foreseeable or proposed agency actions, share common timing or geography").

*Wilderness Areas, National Monuments and National Parks*

Petitioners contend the ANG and FAA failed to adequately analyze the Initiative's impacts on the unique natural quiet, aesthetic, visual and recreational resources associated with certain wilderness areas, wilderness study areas and proposed national parks underlying or immediately adjacent to the Initiative. [12]

---

[12] Petitioners refer specifically to the Great Sand Dunes National Monument, the Florissant Fossil Beds National Monument, the Bent's Old Fort National Monument, the Sangre de Cristo Wilderness, and the Greenhorn

-28-

They support this claim with comments from the Bureau of Land Management, Department of Interior and other agencies, expressing concern over potential impacts the Initiative might have in these sensitive areas and criticizing the ANG and FAA for not fully analyzing those impacts. According to Petitioners, by approving the Initiative, the ANG and FAA have preemptively destroyed the wilderness qualities in these sensitive areas, and have further preempted the authority of Congress and the President to designate additional sensitive areas as wilderness areas in the future.

We begin by noting that the National Environmental Policy Act requires agencies preparing environmental impact statements to consider and respond to the comments of other agencies, not to agree with them. *See* 40 C.F.R. § 1503.4; *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991). The administrative record demonstrates the ANG and FAA considered the concerns expressed by the public and other agencies regarding potential impacts on wilderness and other sensitive areas prior to concluding any such impacts would be negligible. It is certainly Petitioners' prerogative to disagree with that

---

Mountains Wilderness. The parties apparently agree the actual and potential monuments, parks and wilderness areas are located beneath or adjacent to the La Veta MOA, Airburst A MOA, VR-413 and IR-409.

conclusion. However, their emotional assessment of the Initiative's probable impacts on wilderness areas, national monuments and national parks, and/or the ability to designate and manage additional such areas in the future, does not support a National Environmental Policy Act claim.

The National Environmental Policy Act requires only that the agencies make a reasonable, good faith effort to analyze environmental impacts. The record in this case verifies that the agencies identified possible noise impacts on sensitive areas, including wilderness areas, parks and monuments, and reasonably determined, after considering public and agency comment alike, that any impact on these areas would be insignificant, because (1) low-level military training overflights took place in each of the affected airspaces before the Initiative; (2) even with implementation of the Initiative, none of the affected airspaces would experience cumulative noise levels greater than the 55 dB standard considered ideal by the Environmental Protection Agency; and (3) the ANG adopted specific measures, such as avoiding overflights of wilderness when possible and flying a minimum of 2,000 feet above ground level, to mitigate any impact on sensitive areas. We therefore uphold the ANG's and FAA's environmental impact analysis as it pertains to wilderness areas, national monuments and national parks.

*Socioeconomic and Growth*

Petitioners argue the socioeconomic data in the Final Environmental Impact Statement is outdated and inaccurate, in violation of 40 C.F.R. §§ 1500.1(b), 1502.24 (requiring agencies to insure the professional and scientific integrity of environmental information). They cite extra-record 1999 census data and Eric J. Nickell, The Colorado Airspace Initiative and Economic Impacts on Custer, Huerfano and Saguache Counties, Colorado, June, 1993 (Nickell Study), as primary support for their contention the Initiative's socioeconomic impact will be much greater than that identified in the Final Environmental Impact Statement.

The Final Environmental Impact Statement was published in August 1997. Petitioners can hardly criticize that document for failing to utilize 1999 census data. They have neither argued nor shown the agencies must prepare a supplemental environmental impact statement based on updated census information. *See Colorado Envtl. Coalition*, 185 F.3d at 1177-78 (explaining the National Environmental Policy Act does not "require a supplemental environmental impact statement every time new information comes to light. A supplemental environmental impact statement comes into play only if the new information is sufficient to show [the proposed action] will affect the quality of

the human environment in a significant manner or to a significant extent not already considered." (Quotation marks and citations omitted.)). Moreover, the record reveals that both the ANG and the Air Force reviewed the Nickell Study, but discounted it as unreliable. The agencies instead relied on the previously described noise impact analysis *vis-à-vis* impacts on residential and recreational land use; relevant population, housing, employment and earnings data; and comparative residential valuation data and tourism earnings data in each region of influence. The ANG and FAA are entitled to rely on their own experts so long as their decision was not arbitrary and capricious. *Wyoming Farm Bureau Fed'n*, 199 F.3d at 1241. To repeat, "the mere presence of contradictory evidence does not invalidate the [a]gencies' actions or decisions," *id.*, and we will not displace the ANG's and FAA's choice between conflicting views, *Arapahoe County Pub. Airport Auth.*, 242 F.3d at 1218.

We recognize Petitioners do not agree with the agencies' conclusions concerning the Initiative's potential socioeconomic impacts. However, the agencies' socioeconomic impact analysis is supported by substantial evidence in the administrative record, and was adequate to foster informed public participation and decision-making. The socioeconomic impact analysis is neither arbitrary nor capricious.

<u>Reasonable Alternatives</u>

Petitioners claim the alternatives analysis in the Final Environmental Impact Statement fails in two ways. First, they argue the Final Environmental Impact Statement does not include a "true" no-action alternative; and second, they argue the Final Environmental Impact Statement does not consider other reasonable alternatives.

To comply with the National Environmental Policy Act and its implementing regulations, the ANG and FAA are required to rigorously explore all reasonable alternatives to the Initiative, including a "no-action" alternative, in comparative form, and give each alternative substantial treatment in the environmental impact statement. *See* 40 C.F.R. §§ 1502.1, 1502.14(a-b), (d); 42 U.S.C. §§ 4332(2)(C)(iii) & (E); *Colorado Envtl. Coalition*, 185 F.3d at 1174. The National Environmental Policy Act does not, however, "require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective. What is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Colorado Envtl. Coalition*, 185 F.3d at 1174 (quotation marks and citations omitted). We employ the "rule of reason" to ensure the ANG's Final Environmental Impact Statement contains

sufficient discussion of the relevant issues and opposing viewpoints to enable both the ANG and FAA to take a hard look at the environmental impacts of the Initiative and its alternatives, and to make a reasoned decision.     *Id*. "The rule of reason guides both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative."     *American Rivers v. Federal Energy Reg. Comm'n*   , 201 F.3d 1186, 1200 (9th Cir. 1999) (quotation marks and citation omitted).

As to the adequacy of the "no-action alternative," Petitioners claim "the ANG has been unlawfully and increasingly undertaking major federal action that has never been properly subject to environmental review since it began low-level overflights in Colorado decades ago." According to Petitioners, the ANG and FAA inappropriately included this "unlawful activity" in their assessment of the military's current airspace use, and that a "true" no-action alternative may only reflect the impacts of lawful activity. They further criticize the sortie count data in the no-action alternative, claiming it to be "far in excess of any studied or anticipated in any previous environmental analysis." Petitioners cite no applicable legal or factual authority for these propositions, and apparently misunderstand the intended scope and purpose of a no-action alternative.

In requiring consideration of a no-action alternative, the Council on Environmental Quality intended that agencies compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo. *See Association of Pub. Agency Customers, Inc. v. Bonneville Power Admin*., 126 F.3d 1158, 1188 (9th Cir. 1997); 46 Fed. Reg. at 18027. In other words, the current level of activity is used as a benchmark. 46 Fed. Reg. at 18027. This is exactly what the ANG and FAA did. The Final Environmental Impact Statement demonstrates the ANG and FAA compared the impacts of the original proposal and preferred alternative to the impacts of continuing to fly in the existing MTRs and MOAs. This is all the law requires. The requirement to consider a no-action alternative does not provide Petitioners a vehicle in which to pursue allegations that past ANG or FAA actions received insufficient environmental analysis. The time has passed to challenge past actions. [13]

Turning to the adequacy of the range of alternatives considered, Petitioners claim (1) "unstudied" increases in military airspace use over the last two decades

---

[13] The ANG and FAA did in fact consider the alternative of eliminating the Colorado ANG or existing military airspace in Colorado altogether, but found that alternative to be unreasonable. To the extent Petitioners are attempting to challenge that determination, we consider the issue below in our discussion of the range of alternatives.

preempted consideration of other objectively reasonable alternatives; (2) the three alternatives considered were "nearly identical," thus rendering the analysis "legally inadequate;" and (3) the FAA inappropriately committed resources, and thereby prejudiced the selection of alternatives, before making a final decision. These claims, too, are easily dismissed.

Petitioners' claim that "unstudied" (and therefore "unlawful") increases in military airspace use over the last two decades precluded any rigorous analysis of reduced military use alternatives is really another attempt to challenge the legality of past actions. As stated above, the time has passed for such claims.

The Final Environmental Impact Statement identifies seven alternatives the agencies considered: (1) the original proposal; (2) the preferred alternative; (3) the no-action alternative; (4) the use of other MOAs and MTRs; (5) the elimination of the Colorado Air National Guard; (6) the elimination of existing military airspace in Colorado; and (7) the use of aircraft flight simulators. Applying the rule of reason to the question of whether this was a sufficiently broad/diverse range of alternatives for consideration, we look first to the intended purpose of the proposed action. *See Colorado Envtl. Coalition*, 185 F.3d at 1174-75. The primary purpose of the Initiative is to develop adequate

training opportunities for Colorado ANG pilots within the distance limitations specified by the United States Air Force's training standards. The Final Environmental Impact Statement specifically discusses the training criteria against which each alternative was evaluated, and then explains, in some detail, that alternatives four through seven were eliminated from further detailed consideration after preparation of the Draft Environmental Impact Statement because none "allowed military flying units to meet their total training requirements" – *i.e.*, satisfy the very purpose of the Initiative. The three remaining alternatives, which reflect various military airspace configurations and usage within applicable training criteria parameters, are evaluated and compared throughout the Final Environmental Impact Statement.

The National Environmental Policy Act requires only that reasonable alternatives be evaluated. 42 U.S.C. §§ 4332(2)(C)(iii) and (E); 40 C.F.R. §§ 1502.1, 1502.14(a). Alternatives that do not accomplish the purpose of an action are not reasonable. *Colorado Envtl. Coalition*, 185 F.3d at 1174-76; *see also City of Bridgeton*, 212 F.3d at 456. Petitioners have put forth no record evidence disputing the existence or reasonableness of the United States Air Force training criteria, including the training distance limitations, as applied to the Colorado ANG; nor have they identified an alternative the ANG and FAA failed

to consider which satisfies these criteria. Because the administrative record demonstrates the ANG and FAA defined the objectives of the Initiative, identified alternatives that would accomplish those objectives, and took a hard, comparative look at the environmental impacts associated with each reasonable alternative, Petitioners' challenge to the adequacy of the alternatives analysis fails.

Finally, Petitioners' claim that the FAA implemented the Initiative prior to adopting and approving the Final Environmental Impact Statement is not supported by the record. The FAA documents Petitioners cite as evidence the FAA implemented the Initiative prior to issuing the Record of Decision, make clear no final action would take place on MTR modifications until "any changes dictated by the Environmental Division's on-going environmental review can be addressed as a complete package," and the effective date for the proposed MOA modifications would coincide with the final approval of the proposed MTR modifications.

For all these reasons, we conclude the Final Environmental Impact Statement prepared by the ANG and adopted by the FAA satisfies National Environmental Policy Act standards.

*Constitutional Claims*

Fifth Amendment

Petitioners ask this court to enjoin implementation of the Initiative, claiming it "results in an unauthorized taking of private property without due process or the prospect of compensation." [14] According to Petitioners, the approved use of the airspace above their properties is "unauthorized" because (1) the Initiative itself is being implemented illegally – without a finding that it is necessary to the national defense, where substantial evidence shows that it is in fact contrary to the interest of the national defense, and in the absence of National Environmental Policy Act compliance; (2) the FAA violated its own regulations establishing minimum altitudes of navigation at 500 feet from any person or structure; and (3) the FAA unlawfully delegated its statutory responsibility for setting minimum altitudes of flight to the military.

The Fifth Amendment does not preclude the taking of private property for public use. Rather, it requires the government to justly compensate the private property owner for any authorized taking. *See Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 11 (1990). Injunctive relief is not available under the Fifth

_____

[14] Petitioners expressly disavow making a claim for compensation under the Fifth Amendment. They "seek[] only an injunction."

Amendment absent an allegation the purported taking is unauthorized by law. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking.") "Unauthorized" conduct in the takings context equates to the *ultra vires* actions of an agency, *i.e.*, action explicitly prohibited or outside the normal scope of agency responsibilities. An agency may act within its authority even if its action is later determined to be legally erroneous. *See Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1523 (D.C. Cir. 1984), *vacated on other grounds by* 471 U.S. 1113 (1985); *Del-Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358, 1362-63 (Fed. Cir. 1998).

Arguably, if a government agency errs, *i.e.*, exceeds its jurisdiction, violates a statute, or acts arbitrarily or capriciously, it should not be liable for a "taking" under the Fifth Amendment. *See, e.g.*, John D. Echeverria, *Takings and Errors*, 51 Ala. L. Rev. 1047, 1047-48 (2000). We find intriguing the notion that takings involving erroneous government actions cannot be takings for "public use" within the meaning of the Takings Clause, *see id.*; however, we need not debate or decide that issue here. For the reasons stated above, we conclude the Initiative did not violate the Federal Aviation Act, FAA regulations, or the

National Environmental Policy Act. Moreover, Petitioners fail to demonstrate the FAA or ANG exceeded their authority under the relevant laws or regulations. Consequently, Petitioners' claim the Initiative constitutes an "unauthorized" or "unlawful" taking cannot stand. *Cf. Preseault,* 494 U.S. at 13 (finding clear statutory authority for agency action giving rise to Fifth Amendment claims, Supreme Court declined to decide what types of official authorization, if any, are necessary to create Fifth Amendment liability, and whether a taking had occurred, instead leaving petitioners to pursue available Tucker Act remedy). Their request for injunctive relief on Fifth Amendment grounds is denied.

Third Amendment

Petitioners insist they have a Third Amendment right "to refuse military aircraft training in airspace within the immediate reaches of their property," and that military overflights occurring in the immediate reaches of their property during peacetime, and without their consent, "are *per se* unconstitutional."[15] We disagree.

---

[15] The Third Amendment to the United States Constitution provides "[n]o Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law." U.S. Const. Amend. III.

Judicial interpretation of the Third Amendment is nearly nonexistent. The crux of any such claim, however, is whether the nature of the asserted property interest falls "within the ambit of the Third Amendment's proscription against quartering troops 'in any house, without the consent of the Owner.'" *Engblom v. Carey*, 677 F.2d 957, 961-62 (2d Cir. 1982). Citing *Engblom v. Carey*, Petitioners argue that "[b]ecause a private party has rights to the airspace above his or her property ... the United States military may not appropriate such property interests during peacetime without the property owners' consent." This argument borders on frivolous.

In *Engblom*, the Second Circuit held that "property-based privacy interests protected by the Third Amendment are not limited solely to those arising out of fee simple ownership but extend to those recognized and permitted by society as founded on lawful occupation or possession with a legal right to exclude others." 677 F.2d at 962. On that basis, and referring to Fourth Amendment "legitimate expectation of privacy" doctrine by analogy, the court reversed the summary dismissal of a Third Amendment claim raised by striking correction officers who, without their consent, were displaced from staff housing by national guard members the State of New York brought in to staff the prison. *Id*. at 962-64. According to the majority, the rooms in which the striking correction officers

-42-

claimed a Third Amendment property interest were, for all intents and purposes, their homes. *Id*. at 963. The striking officers were evicted from those rooms in order to quarter national guardsmen sent to staff the prison during the strike. These facts obviously presented a much closer question than Petitioners present here.

The property Petitioners seek to protect is the airspace above their land. Taken to its logical extreme, Petitioners would have the United States military seek consent from every individual or entity owning property over which military planes might fly, and then design its training exercises to utilize only that airspace for which permission was granted, or else risk Third Amendment liability. We simply do not believe the Framers intended the Third Amendment to be used to prevent the military from regulated, lawful use of airspace above private property without the property owners' consent. *See id.* at 966-67 (Kaufman, Circuit Judge, concurring in part and dissenting in part) (summarizing historical origin of Third Amendment). Fourth Amendment principles do not instruct to the contrary. Petitioners' Fourth Amendment rights would be violated only if society is willing to recognize their subjective expectation of privacy in the airspace above their property as reasonable. *See California v. Ciraolo*, 476 U.S. 207, 211-12 (1986). It is not reasonable to expect privacy from the lawful

operation of military aircraft in public navigable airspace. *See United States v. Causby*, 328 U.S. 256, 261 (1946) (acknowledging that while a Fifth Amendment remedy might exist if flights over private property directly and immediately interfere with the enjoyment and use of the land, Congress has declared "[t]he air is a public highway" and "[c]ommon sense revolts at the idea" that aircraft operators would be subject to trespass suits based on common law notions of property ownership extending to the periphery of the universe). Accordingly, Petitioners' Third Amendment claim fails.

CONCLUSION

Because we hold (1) the FAA did not violate the Federal Aviation Act, FAA regulations or the Administrative Procedure Act; (2) the Final Environmental Impact Statement for the Initiative satisfied the National Environmental Policy Act; and (3) Petitioners failed to establish a violation of either the Fifth or Third Amendments to the United States Constitution, we deny the Petition for Review and **AFFIRM** the challenged agency orders.